**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **Rodney Butler,** § | |
| *Plaintiff* § | |
| § | |
| v. § | Civil Action No. 3:21-cv-688 |
| § | |
| **Bent Tree Country Club, Inc.,** § | |
| *Defendant.* § | |

**PLAINTIFF'S ORIGINAL COMPLAINT & JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Rodney Butler ("Mr. Butler") hereby files this Original Complaint & Jury Demand complaining of employment discrimination against Defendant Bent Tree Country Club, Inc. (hereinafter "Defendant" or "Bent Tree"). Mr. Butler, a former African-American maintenance employee of the Country Club, sets out his causes of action for the Court as follows:

**I.   PARTIES**

1. Plaintiff Rodney Butler is an individual residing in Seagoville, Texas.

2. Defendant Bent Tree Country Club, Inc. is a domestic nonprofit corporation authorized to do business in the State of Texas.

3. Specifically, Defendant owns and operates an "exclusive" Country Club in the City of Dallas whose membership includes "chairmen and presidents from many of the Fortune 500 businesses, athletic figures from football to golfing greats, among several of the past mayors

1

of Dallas and many others…"

4. Defendant can be served with process by serving its registered agent, C T Corporation System, 1999 Bryan St. Suite 900, Dallas, TX 75201.

## II. JURISDICTION AND VENUE

5. The Court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. § 1331 & § 1343.

6. Venue exists in this district and division under 28 U.S.C. § 1391 because Defendant resides in the City of Dallas and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the City of Dallas at Bent Tree Country Club.

## III. FACTUAL ALLEGATIONS

### Butler Provides Loyal and Diligent Service to Bent Tree Country Club for Ten Years

7. Mr. Butler is an African-American male.

8. Mr. Butler began working for Bent Tree Country Club in 2010 as a maintenance repairman.

9. Mr. Butler was a loyal and hard-working employee.

10. At the time of his termination, Mr. Butler had worked his way up to the position of Assistant to the Maintenance Manager.

### Bent Tree Singles Butler Out for a One-Man "Layoff" During the COVID19 Pandemic

11. Bent Tree Country Club terminated Mr. Butler's employment in July of 2020.

12. Prior to the termination, Bent Tree Country Club had placed a number of employees including Mr. Butler on furlough due to the COVID-19 pandemic.

13. By early summer, Bent Tree Country Club began to call all of its employees back to work.

14. Mr. Butler fully expected to be called back to work, not only because all other

2

employees in the company were being called back to work, but also because his job and skill set were critical to Bent Tree's operations.

15. Mr. Butler was one of only two inside building maintenance employees at Bent Tree Country Club.

16. Mr. Butler's direct supervisor, Wilfred Gillette, told Mr. Butler on a number of occasions during the furlough that he, Mr. Gillette, really needed Mr. Butler back at work to help handle the high workload in the maintenance department.

17. Instead, Ms. Karen Eubanks called Mr. Butler in July of 2020 to inform him that he was being permanently laid off.

18. Ms. Eubanks told Mr. Butler that Bent Tree had decided to eliminate his maintenance position.

19. On information and belief, Bent Tree did not lay off any employees other than Butler in July of 2020.

**Bent Tree's White General Manager and White Human Resources Manager Unilaterally Decide to Terminate Butler Against the Wishes of Butler's Direct Supervisor**

20. Karen Eubanks is the Human Resources Manager and Payroll Director for Bent Tree.

21. Ms. Eubanks is white and Caucasian.

22. When Ms. Eubanks called to let Mr. Butler go, Ms. Eubanks told Mr. Butler not to talk to Mr. Gillette about the termination because Mr. Gillette had not yet been informed that Bent Tree was letting Mr. Butler go.

23. Mr. Gillette is from Belize and of African descent.

24. Later that day, after Bent Tree informed Mr. Gillette of Mr. Butler's termination, Mr. Gillette called Mr. Butler.

3

25. Mr. Gillette told Mr. Butler that he (Mr. Gillette) still needed Mr. Butler in the maintenance department.

26. Mr. Gillette also said that he (Mr. Gillette) had specifically asked Mr. Burkett to bring Mr. Butler back to work.

27. Dan Burkett was the General manager of Bent Tree Country Club at the time of Mr. Butler's termination.

28. Mr. Burkett is white and Caucasian.

29. On information and belief, despite being Mr. Butler's direct supervisor, Mr. Gillette was not consulted about the decision to terminate Mr. Butler's employment.

30. Instead, Ms. Eubanks and Mr. Burkett made the decision to single Mr. Butler out for a one-man "layoff."

31. On information and belief, Ms. Eubanks and Mr. Burkett singled Mr. Butler out for termination because Mr. Butler is African-American and had made prior reports of race discrimination against the Country Club.

### **Bent Tree Lacks Any Legitimate Reason to Terminate Butler**

32. There was no legitimate business reason for Bent Tree to terminate Mr. Butler's employment in July of 2020.

33. Bent Tree called all of the white and Hispanic employees in the maintenance department back to work.

34. Bent Tree also called back other employees from different departments even when their departments did not need them and simply gave those employees assignments in different departments.

35. Because of Mr. Butler's broad skill set, Mr. Butler could have easily worked

4

assignments in other Bent Tree departments, had Bent Tree truly not needed Mr. Butler back in the maintenance department.

36. However, the maintenance department did still need Mr. Butler at the time of his "layoff."

37. Bent Tree began using an employee who worked as a food runner to perform inside maintenance repair work after Mr. Butler was terminated, showing that Mr. Butler's services were still needed.

38. Mr. Butler's termination was also not due to his age or abilities.

39. A white individual with cancer who was over 80 years old who also worked in the maintenance department was called back into work.

40. Additionally, Mr. Butler's termination was not due to budgetary concerns.

41. Mr. Butler's salary was approximately $45,000 per year.

42. Bent Tree received a Paycheck Protection Program (PPP) loan as a result of COVID-19 to cover employee salaries.

43. Bent Tree had adequate funds to continue to pay Mr. Butler's salary along with the salary of the other employees it called back to work as of July of 2020.

**Bent Tree's Termination of Butler
Continues a History of Race Discrimination Against Butler**

44. Mr. Butler's termination was not the only time Ms. Eubanks and Mr. Burkett had treated Mr. Butler differently due to his African-American race.

45. In the Spring of 2018, Mr. Butler's son, Rashad, applied for a job at the Country Club in the food and beverage department.

46. Mr. Butler's son is African-American, like his dad.

47. Ross Rhodes, the Food and Beverage Manager at the time, set up an interview

5

with Rashad.

48. Ms. Eubanks and Mr. Burkett, however, informed Mr. Rhodes that he could not hire Rashad because there was a new policy against hiring family members.

49. Rashad's job application was rejected, allegedly because of the new policy.

50. Mr. Rhodes apologized to Mr. Butler, explaining the situation was out of his hands.

51. However, following this supposed change in policy, Ms. Eubanks' white grandson and white nephew were both hired by Bent Tree.

52. Ms. Eubanks' white grandson and white nephew were also granted special treatment and allowed to eat in the club's dining facilities and from the buffet, something other employees were not allowed to do.

53. Many other employees' immediate family members have been hired to work at the club.

54. For example, Defendant hired the white son and white daughter of the Club's Tennis Professional to work at the Club as well.

### Butler Expresses Internal Concerns about Race Discrimination at the Country Club

55. Mr. Butler told Mr. Rhodes, who is also African-American, that he believed Bent Tree had discriminated against him and his son based on their race.

56. Mr. Butler had also informed his direct supervisor Mr. Gillette, and Mr. Burkett's predecessor, Mr. Baityeh, about his specific concerns of race discrimination.

### Bent Tree´s White Managers Deny Butler His Earned Vacation Time.

57. In 2015, Mr. Butler was supposed to get three weeks of vacation time for completing five years of employment at Bent Tree.

6

58. Ms. Eubanks, however, denied Mr. Butler his earned vacation time for pretextual reasons.

59. Mr. Butler's direct supervisor at the time, Mr. Gillette, told Ms. Eubanks that Mr. Butler qualified for his three weeks of vacation based on his continuous employment with Bent Tree.

60. Even after that, Ms. Eubanks refused to change her mind about denying Mr. Butler his three weeks of vacation. Ms. Eubanks did not take away or reduce the amount of vacation time of any other employees who were white or not African-American.

61. When Mr. Burkett became General Manager, Mr. Butler went to talk to Mr. Burkett about the ongoing issue with his vacation time, and other issues involving his advances and Christmas bonuses.

62. At that time, Mr. Burkett made a decision to give back Mr. Butler back one out of the three weeks of vacation time Mr. Butler had earned.

63. Mr. Burkett still refused to give Mr. Butler back his other two weeks of vacation.

### Bent Tree´s White Human Resources Manager Gives White Employees with Less Seniority Larger Bonuses than Butler

64. Ms. Eubanks was also in charge of calculating Christmas bonuses.

65. Bonuses were supposed to be calculated based on seniority with Bent Tree and contributions to Bent Tree in terms of the number of hours worked per year.

66. Mr. Butler's seniority date was 2010 and he consistently worked a significant number of hours due to the demands of the maintenance department and the short-staffing of his particular area, inside maintenance.

67. Year after year, however, Ms. Eubanks paid Mr. Butler a smaller Christmas bonus than the bonuses she paid to white and Hispanic employees who had similar or less seniority and

7

had worked similar or less hours in the preceding year.

68. One year, Mr. Butler received a bonus of $700, while white employees who had been with Bent Tree for less time received bonuses in excess of $1,000.

69. Another year, a white employee who had worked at Bent Tree for less than one year received a Christmas bonus that was twice the amount of Mr. Butler's bonus.

### Bent Tree´s White Human Resources Manager Requires Butler to Repay His Paycheck Advance on Less Favorable Terms Than White Employees

70. Ms. Eubanks was also in charge of deciding whether to give employees advances on their paychecks and the terms of repayment.

71. When Mr. Butler took an advance on his paycheck, Ms. Eubanks made Mr. Butler repay his advances at a higher rate than the other employees who were not African-American.

72. Other employees who were not African-American would pay back their advances at $50 per pay period, while Mr. Butler was forced to repay $150 per pay period.

73. Ms. Eubanks also continued taking repayment withdrawals out of Mr. Butler's paychecks even after the full balance was paid.

74. In the end, Ms. Eubanks overcharged Mr. Butler by approximately $750.

75. Ms. Eubanks never reimbursed Mr. Butler this extra $750 that she had overcharged him, causing Mr. Butler to lose $750 in pay that he was in fact owed by Bent Tree.

76. With white employees, however, Ms. Eubanks has not even required some of those employees to fully pay back their advances before taking additional advances or before leaving the company.

77. Ms. Eubanks was not the only one who constantly discriminated against Mr. Butler based on his race.

**Bent Tree´s White General Manager Treats Butler with Disrespect and Distrust.**

78. When Mr. Burkett became General Manager in January of 2018, Bent Tree's treatment of Mr. Butler worsened.

79. When Mr. Burkett would walk into a room that Mr. Butler was in with another person, Mr. Burkett would physically turn away from Mr. Butler, and would not face him or speak to him.

80. Mr. Burkett did not physically turn away from or refuse to face or speak to employees who were white or not African American.

81. Mr. Burkett also treated Mr. Butler with distrust, despite there being no legitimate reason for Mr. Burkett not to trust Mr. Butler.

82. Maintenance is Mr. Butler's trade.

83. When there were problems with the heating system around March of 2020, Mr. Butler informed Mr. Burkett of the problem and how it would need to be fixed.

84. Mr. Burkett became enraged at Mr. Butler and talked down to Mr. Butler like Mr. Butler did not know what he was talking about.

85. Mr. Burkett yelled at Mr. Butler so loud that it garnered the attention of other employees, leading one to ask Mr. Butler why Mr. Burkett was yelling at him, and told him that it was not his fault the heating system was broken.

86. Instead of trusting Mr. Butler's diagnosis, Mr. Burkett hired a white outside contractor to look at the broken heating system.

87. When the outside contractor said the same thing Mr. Butler had said, only then did Mr. Burkett approve the repair.

88. Mr. Burkett did not yell at, talk down to, or second guess the professional

opinions of other employees who were white and not African-American.

89. Situations like this one occurred frequently with Mr. Burkett refusing to listen to or accept Mr. Butler's recommendations on work-related issues.

90. Mr. Burkett also did not trust Mr. Butler when it came to borrowing tools from Bent Tree.

91. It was common for employees to borrow tools from Bent Tree.

92. However, Mr. Burkett always treated Mr. Butler as though he was going to steal the tools.

93. On one occasion, Mr. Butler once asked Mr. Burkett if he could borrow a gas saw to cut down a tree.

94. Mr. Burkett told Mr. Butler that he (Mr. Butler) could borrow a hand saw instead.

95. Mr. Burkett made this comment knowing it would be much more difficult and take a lot more time for Mr. Butler to cut down a tree with a hand saw as opposed to a gas saw.

96. On another occasion, Mr. Burkett did give Mr. Butler permission to borrow the gas saw, but after Mr. Butler placed the saw in his truck, two men from maintenance came up to Mr. Butler's truck and took the saws out of Mr. Butler's truck.

97. The maintenance men apologized to Mr. Butler for taking the saw out of his trick but said it was out of their hands.

98. When Mr. Butler asked Mr. Burkett why the men had removed the saw from his truck when he had permission to borrow it, Mr. Butler expressed doubt about whether Mr. Butler was going to "guard" the saw, insinuating that it would go missing in Mr. Butler's possession.

99. When Mr. Butler then asked Mr. Burkett if anyone else got questioned like this, Mr. Burkett gave him a dead stare and did not respond.

100. However, a few weeks earlier, a Hispanic employee had borrowed a tool and there were no issues concerning whether he would safeguard and return the tool.

101. Mr. Burkett also excluded Mr. Butler from Bent Tree's annual veteran's day ceremony.

102. Every year, Bent Tree honors veterans and holds a ceremony for its employees who have served in the armed forces.

103. Everyone at Bent Tree knows that Mr. Butler is a veteran and served in Desert Storm.

104. Yet, since becoming General Manager in January of 2018, Mr. Burkett has never once included or honored Mr. Butler in the annual veteran's day ceremony at Bent Tree.

105. White and Hispanic employees who are veterans have been honored in the 2018, 2019, and 2020 annual veteran's day ceremonies.

## IV.   FIRST CAUSE OF ACTION: RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C.S. § 1981

106. Mr. Butler incorporates the allegations contained in the preceding paragraphs and incorporates by reference

107. 42 U.S.C. § 1981 ("Section 1981") guarantees, among other things, "all persons … the same right … to make and enforce contracts … as is enjoyed by white citizens."

108. As a Black African-American employee, Mr. Butler had the right to the same terms, privileges, and conditions of employment as white and non-African-American employees.

109. Plaintiff's claims of intentional race discrimination against Defendant are brought pursuant to the requirements and obligations of the statute.

110. Defendant, Bent Tree Country Club, Inc., was Plaintiff's employer.

111. Defendant intentionally subjected Plaintiff to discrimination with respect to his

employment on the basis of Plaintiff's African-American race, including denying him earned vacation time, denying him the same Christmas bonuses as similarly-situated employees, overcharging him for paycheck advances, and terminating his employment.

112. Defendant would not have terminated Plaintiff's employment "but for" Plaintiff's race.

113. Defendant would not have reduced Plaintiff's vacation time from three weeks to just one week, despite his ten years of seniority and tenure, but for Plaintiff's race.

114. Defendant would not have denied Plaintiff fair and equitable Christmas bonuses or overcharged him for his paycheck advances "but for" Plaintiff's race.

115. Defendant intentionally and maliciously discriminated against Plaintiff because of Plaintiff's African-American race, acting with malice and reckless disregard for Plaintiff's constitutional rights guaranteed under Section 1981.

116. Defendant's racially discriminatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's constitutional rights as guaranteed under Section 1981.

117. Plaintiff seeks to recover the value of his denied and lost vacation, bonuses, wages and benefits for the four year period preceding this filing, as well as future wages and benefits lost as a result of his July 2020 wrongful termination, and damages resulting from the long-term harm to his career, punitive damages, reasonable attorneys fees and court costs, and pre-judgement and post-judgement interest as permitted by law.

118. Plaintiff seeks to recover these losses through this cause of action.

## V.   SECOND CAUSE OF ACTION: RETALIATION UNDER 42 U.S.C. § 1981

119. Plaintiff incorporates by reference the allegations in the preceding paragraphs as

12

fully set forth herein.

120. Plaintiff engaged in a protected activity when he opposed and complained of racial discrimination and informed management of his good faith belief about the discrimination.

121. Defendant was aware of such activity; and terminated Plaintiff's employment in retaliation for Plaintiff's opposition to its racially discriminatory conduct.

122. Defendant's retaliatory actions were intentional, malicious, and committed with reckless disregard for the consequences of those actions.

123. Defendant's retaliatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's constitutional rights as guaranteed under Section 1981.

124. Specifically, Defendant's unlawful actions caused Plaintiff a loss of wages and income and harm to his career, his future employment prospects, and his professional reputation, and other incidental losses, including the expense of court costs and attorney fees in seeking to protect and enforce his rights.

125. Plaintiff seeks to recover these losses through this cause of action.

## VI.     JURY DEMAND

Mr. Butler demands a trial by jury on all of his causes of action.

## VII.     PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Mr. Butler prays that Defendant be cited to appear and answer herein, and that on final trial, Mr. Butler have and recover the following relief against Defendant:

a. Judgement against Defendant for actual damages going back four years prior to the date this lawsuit was filed and continuing into the future, including past and future lost wages, lost vacation pay, lost bonus monies, and lost fringe benefits,

13

        the sum to be determined at the time of trial;

b.    Judgement against Defendant for compensatory damages (including damages for mental anguish) in the maximum amount allowed by law;

c.    Judgement against Defendant for punitive damages in the maximum amount allowed under law;

d.    An order that Defendant take such other and further actions as may be necessary to redress Defendant's violation of Section 1981, including, if applicable, reinstating Plaintiff to his former position (or front pay if not feasible), and injunctive relief to prevent further discriminatory practices;

e.    Pre-judgement and post-judgement interest at the maximum rate allowed by law;

f.    Costs of suit, including attorney's fees; and

g.    The award of such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled.

Dated: March 24, 2021

Respectfully submitted,

**TREMAIN ARTAZA, PLLC**

/s/ *Christine A. Hopkins*
Christine A. Hopkins
Texas State Bar No. 24095768
christine@tremainartaza.com
Ashley E. Tremain
Texas State Bar No. 24066209
ashley@tremainartaza.com
13140 Coit Rd., Ste 104
Dallas, Texas 75224
Tel: (469) 573-0297
Fax: (214) 379-0838

**COUNSEL FOR PLAINTIFF RODNEY BUTLER**